# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED by ____ D.C.
ELECTRONIC

**Feb. 3, 2010**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

| | |
|---|---|
| **ARLENE S. HEILBRUNN,** as an individual and on behalf of all others similarly situated, | **Civil No.:** |
| *Plaintiff,* | **CLASS ACTION COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** |
| vs. | *JURY TRIAL REQUESTED* |
| **TOYOTA MOTOR CORPORATION,** a foreign corporation, **and TOYOTA MOTOR SALES, USA, INC.,** a California corporation, | **10-80208-Civ-Zloch/Rosenbaum** |
| *Defendants.* | |

Plaintiff alleges:

## I. PARTIES

1.     Plaintiff Arlene S. Heilbrunn ("Plaintiff") is an individual consumer, who at all times material hereto, was and is a resident of the State of Florida.

2.     Defendant Toyota Motor Corporation is a Japanese Corporation having its principal place of business at 1 Toyota-Cho, Toyota City, Aichi Prefecture 471-8571, Japan. Toyota Motor Corporation designs, develops and manufactures automobiles that are sold throughout the world.

3.     Defendant Toyota Motor Sales, USA, Inc. is a corporation organized and existing under the laws of the State of California with its principal executive offices located at 19001 S.2. Western Avenue, Torrance, California 90509.   Toyota Motor Sales, USA, Inc. markets, distributes and sells vehicles manufactured by Defendant Toyota Motor Corporation throughout the United States.

## II. JURISDICTION AND VENUE

4.     This court has jurisdiction over this class action under 18 U.S.C. § 1332(d), which under the provisions of the Class Action Fairness Act ("CAFA") explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the plaintiff class is a citizen of a State different from any defendant, and in which

the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual class members in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). Plaintiff is a citizen of the State of Florida, whereas, as set forth above, Defendant Toyota Motor Corporation is a citizen of a foreign country, Japan, and Defendant Toyota Motor Sales, USA, Inc. is a citizen of the State of California. Furthermore, Plaintiff alleges that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B). Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

5.      Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged occurred in this district, Plaintiff resides in the this District, and Toyota Motor Corporation and Toyota Motor Sales, USA, Inc. are subject to personal jurisdiction in this District.

### III. FACTUAL ALLEGATIONS

6.      Toyota Motor Corporation is the world's largest automobile manufacturer, with approximately $270 billion in revenue. It designs and develops a wide range of automobiles including the brands Toyota, Lexus and Scion.

7.      Toyota Motor Sales, USA, Inc., a subsidiary of the Toyota Motor Corporation, distributes, markets, and sells the Toyota, Lexus and Scion automobiles throughout the United States (Toyota Motor Corporation and Toyota Motor Sales, USA, Inc. collectively referred to as "Toyota"). Approximately two million Toyota vehicles are sold annually in the United States through over 1,500 dealerships.

8.      Toyota prides itself on the safety of its vehicles. The website www.SafetyToyota.com, devoted exclusively to promoting the safety of Toyota vehicles, clams:

> "What can we do to realize an ideal vehicle, which is a goal we never cease pursuing? That is what we always have in mind. What technology can prevent an accident in any situation and minimize the damage in an accident? Toyota has been developing various safety technologies by using variant means…, in addition to the verification at the collision test center that can reproduce many different types of accidents. 'What causes accidents?' 'What can be done to prevent accidents?' 'What mitigates the damage of accidents that have occurred?' These are the questions to which we are constantly seeking answers. Our technologies will continue to advance toward the ultimate goal of making a vehicle that is safe for everybody."

9.     Toyota automobile owners have been reporting incidents of sudden unintended acceleration of their vehicles since the 1990s.  Sean Kane, a safety researcher, reported that he had found 19 deaths and 341 injuries stemming from 815 separate crashes involving Toyotas and sudden acceleration.  *See* "Toyota Accused Of 'Not Being Frank' On Problem" as Exhibit A, attached hereto.

10.    The National Highway Traffic Safety Administration ("NHTSA"), which helps investigate consumer complaints of automotives, has, over the years, received far more sudden acceleration complaints for Toyota vehicles than for any other manufacturer.  As a result of these complaints, NHTSA has launched more investigations into Toyota vehicles concerning this issue than all other automobile manufacturers combined.  These investigations, relying on data provided by Toyota, had concluded that most of the accidents were caused by drivers accidentally hitting the accelerator pedal as opposed to the brakes.

11.    Further, Toyota has downplayed or dismissed owner complaints, blaming it on driver error or other situation-specific reasons.

12.    In 2007, due to an overwhelming number of customer complaints, Toyota conducted an investigation and determined that the floor mats were the cause of the accelerator problems, as it had the tendency to obstruct the accelerator pedal.  Toyota further announced that the accelerator pedals were in no way a safety threat.

13.    On August 28, 2009, California Highway Patrol Officer Mark Saylor, while driving on the San Diego Freeway, could not slow down his 2009 Lexus ES 350 even after continuously applying the brakes, reaching speeds upwards of 130 miles per hour. While driving, he was on the phone with the police dispatcher and said: "We're in trouble…There's no brakes."  Moments later, Officer Saylor, as well as three others on board, were dead.

14.    A month after the Saylor tragedy, and after mounting pressure, Toyota recalled approximately four million vehicles from model years as far back as 2004 (the "September 2009 Recall").

15.    Toyota, however, again claimed that the recall was due to improper installation of floor mats causing them to jam the accelerator pedal, and no defect with the accelerator existed.   NHTSA, who believed there was an underlying problem with the accelerator pedals, criticized Toyota for making "inaccurate and misleading statements."

16.     Shortly after the September 2009 Recall, the Los Angeles Times conducted an investigation into Toyota's safety issues over the past several years. *See* "Toyota Found To Keep Tight Lid On Potential Safety Problems" attached hereto as Exhibit B.   The article found:

> " * The automaker knew of a dangerous steering defect in vehicles including the 4Runner sport utility vehicle for years before issuing a recall in Japan in 2004. But it told regulators no recall was necessary in the U.S., despite having received dozens of complaints from drivers. Toyota said a subsequent investigation led it to order a U.S. recall in 2005.
>
> * Toyota has paid cash settlements to people who say their vehicles have raced out of control, sometimes causing serious accidents, according to consumers and their attorneys. Other motorists who complained of acceleration problems with their vehicles have received buybacks under lemon laws.
>
> * Although the sudden acceleration issue erupted publicly only in recent months, it has been festering for nearly a decade. A computerized search of NHTSA records by The Times has found Toyota issued eight previous recalls related to unintended acceleration since 2000, more than any other automaker.
>
> * A former Toyota lawyer who handled safety litigation has sued the automaker, accusing it of engaging in a "calculated conspiracy to prevent the disclosure of damaging evidence" as part of a scheme to "prevent evidence of its vehicles' structural shortcomings from becoming known" to plaintiffs lawyers, courts, NHTSA and the public."

17.     On January 21, 2010, Toyota finally admitted that the accelerators were not entirely free from defects, as Toyota had stated time and time again, announcing in a press release that "Our investigation indicates that there is a possibility that certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position or return slowly to the idle position."

18.     Following the announcement, Toyota announced an additional recall of 2.3 million U.S. built cars and trucks (the "January 2010 Recall") (all Toyota vehicles recalled for the sudden acceleration problem referred to as "Recalled Vehicles").   These models included the 2009-2010 RAV4, 2009-2010 Corolla, 2009-2010 Matrix, 2005-2010 Avalon, 2007-2010 Camry, 2010 Highlander, 2007-2010 Tundra, and the 2008-2010 Sequoia.

19.     On January 30, 2010, the January 2010 Recall was broadened to include Toyota vehicles sold overseas, including a recall of 1.8 million units in Europe.  As of the date of this recall, the total number of Toyota vehicles recalled is upwards of 7 million units.

20.     Plaintiff is an owner of a **2009 Toyota Corolla LE,** whose Toyota vehicle may no longer be safe to operate due to a potential sudden acceleration problem caused by a defective accelerator pedal.

## IV. CLASS ALLEGATIONS

21.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

22.     Pursuant to F.R.C.P. 23, Plaintiff brings this action on behalf of herself and the Class comprised of all other consumers who purchased the Recalled Vehicles during the relevant time period.  Toyota's practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class.  All putative Class members were and are similarly affected by having purchased the Recalled Products for their intended and foreseeable purpose as promoted, marketed, advertised, packaged and labeled by Toyota as set forth in detail above, and the relief sought herein is for the benefit of Plaintiff and members of the putative Class.  Plaintiff alleges that the Class is so numerous that joinder of all members would be impractical.

23.     Based on the annual sales of the Recalled Vehicles and the popularity of the Recalled Vehicles, it is apparent that the number of consumers of the Recalled Vehicles would at least be in the many thousands, thereby making joinder impossible. Questions of law and fact common to the Class exist and predominate over questions affecting only individual members, including, *inter alia*:

(a)     Whether Toyota was unfair or deceptive in its design, testing, manufacture, assembly, development and sale of the Recalled Vehicles, thereby violating Florida's Deceptive and Unfair Trade Practices, Fla. Stat. §§ 501.201, *et seq.*;

(b)     Whether Toyota breached express warranties in its sale of the Recalled Vehicles, thereby causing harm to Plaintiff and other Class members;

(c)     Whether Toyota breached implied warranties in its sale of the Recalled Vehicles, thereby causing harm to Plaintiff and other Class members;

(d)    Whether Toyota fraudulently concealed the risks associated with its design, testing, manufacture, assembly, development and sale of the Recalled Vehicles; and

(e)    Whether Toyota's practices in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Recalled Vehicles unjustly enriched Toyota at the expense of, and to the detriment of, Plaintiff and other Class members.

24.    The claims asserted by Plaintiff in this action are typical of the claims of other Class members as the claims arise from the same course of conduct by Toyota, and the relief sought is common.

25.    Plaintiff will fairly and adequately represent and protect the interests of the Class members. Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation.

26.    Certification of this class action is appropriate under F.R.C.P. 23(b) because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action remedy, it would be highly unlikely that the representative Plaintiff or any other Class member would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery. Certification is also appropriate because Toyota acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole. Further, given the large number of consumers of the Recalled Vehicles, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

27.    A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## V.  FIRST CAUSE OF ACTION

### (BREACH OF EXPRESS WARRANTY)

28.    Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

29.    Toyota provided Plaintiff and other members of the Class with written express warranties including, but not limited to, that the Recalled Vehicles were completely safe to operate.  Specifically, Toyota's website promises that their ultimate goal is "making a vehicle that is safe for everybody."

30.    Toyota breached these express warranties which resulted in damages to Plaintiff and other members of the Class, who overpaid for the Recalled Vehicles, as the Recalled Vehicles were not safe as they may contain a defective accelerator pedal mechanism causing sudden acceleration, potentially resulting in death, and as such, the Recalled Vehicles were not safe to operate.

31.    As a proximate result of the breach of warranties by Toyota, Plaintiff and Class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for a product that did not conform to what was promised as promoted, marketed, advertised, packaged and labeled by Toyota, and they were deprived of the benefit of their bargain and spent money on a product that did not have any value or had less value than warranted or a product they would not have purchased and used had they known the true facts about it. Plaintiff and other members of the class are further harmed in having to spend money on attaining other transportation while the Recalled Vehicles are being fixed. Additionally, or in the alternative, Plaintiff and other members of the class suffered actual damages, including a diminution of value of the subject vehicles (the difference in market value of the product in the condition in which it was delivered, and its market value in condition in which it should have been delivered according to contract of parties).

## VI.  SECOND CAUSE OF ACTION

### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

32.    Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

33.     Plaintiff and other Class members purchased Toyota's Recalled Vehicles, which were promoted, marketed, advertised, packaged and labeled as being safe to operate. Pursuant to these sales, Toyota impliedly warranted that the Recalled Vehicles would be merchantable, including that the Recalled Vehicles would be fit for the ordinary purposes for which such goods are used and conform to the promises or affirmations of fact made in the Recalled Vehicle's promotions, marketing, advertising, packaging and labels.   In doing so, Plaintiff and other Class members relied on Toyota's representations that the Recalled Vehicles were safe to operate, and at or about that time, Toyota sold to Plaintiff and other Class members the Recalled Vehicles.  By its representations regarding the reputable nature of its company and related entities, and by its promotion, marketing, advertising, packaging and labeling of the Recalled Vehicles, Toyota warranted that the Recalled Vehicles were safe to operate.  Plaintiff and Class members bought the Recalled Vehicles from Toyota, relying on Toyota's representations that the Recalled Vehicles were safe to operate, however, these vehicles may have contained a defective accelerator pedal mechanism causing sudden acceleration which could potentially result in death.

34.     Toyota breached the warranty implied at the time of sale in that Plaintiff and Class members did not receive a vehicle which was safe to operate and thus, the goods were not merchantable as fit for the ordinary purposes for which such goods are used or as promoted, marketed, advertised, packaged, labeled or sold.

35.     As a proximate result of this breach of warranty by Toyota, Plaintiff and Class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for a product that did not conform to what was promised as promoted, marketed, advertised, packaged and labeled by Toyota, and they were deprived of the benefit of their bargain and spent money on a product that did not have any value or had less value than warranted or a product they would not have purchased and used had they known the true facts about it.  Plaintiff and other members of the class are further harmed in having to spend money on attaining other transportation while the Recalled Vehicles are being fixed. Additionally, or in the alternative, Plaintiff and other members of the class suffered actual damages, including a diminution of value of the subject vehicles (the difference in market value of the product in the condition in which it was delivered, and its market value in condition in which it should have been delivered according to contract of parties).

## VII.  THIRD CAUSE OF ACTION

## (BREACH OF IMPLIED WARRANTY OF FITNESS FOR PARTICULAR PURPOSE)

36.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

37.     Plaintiff and other Class members purchased Toyota's Recalled Vehicles, which were promoted, marketed, advertised, packaged and labeled as being safe to operate. Pursuant to these sales and by its representations regarding the reputable nature of its company and related entities, Toyota impliedly warranted by its promotion, marketing, advertising, packaging and labeling of the Recalled Vehicles that they were safe to operate.  Plaintiff and Class members bought the Recalled Vehicles from Toyota, relying on Toyota's skill and judgment in furnishing suitable goods as well as Toyota's representations that the Recalled Vehicles were safe to operate.  However, Toyota's Recalled Vehicles were not safe to operate as they may have contained a defective accelerator pedal mechanism causing sudden acceleration potentially resulting in death.

38.     Toyota breached the warranty implied at the time of sale in that Plaintiff and Class members did not receive products that were safe to operate as they possibly contained a defective accelerator pedal mechanism potentially resulting in death, and thus the goods were not fit for the purpose as promoted, marketed, advertised, packaged, labeled or sold.

39.     As a proximate result of this breach of warranty by Toyota, Plaintiff and Class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for a vehicle that did not conform to what was promised as promoted, marketed, advertised, packaged and labeled by Toyota, and they were deprived of the benefit of their bargain and spent money on a product that did not have any value or had less value than warranted or a product they would not have purchased and used had they known the true facts about it..  Plaintiff and other members of the class are further harmed in having to spend money on attaining other transportation while the Recalled Vehicles are being fixed. Additionally, or in the alternative, Plaintiff and other members of the class suffered actual damages, including a diminution of value of the subject vehicles (the difference in market value of the product in the condition in which it was delivered, and its market value in condition in which it should have been delivered according to contract of parties).

## VIII. FOURTH CAUSE OF ACTION

## (FRAUDULENT CONCEALMENT)

40.     Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

41.     Toyota had a duty to disclose the truth about risks associated with the design, testing, manufacture, assembly and development of the Recalled Vehicles as set forth in detail above, but delayed and failed to do so.

42.     Toyota concealed these facts relating to the accelerator pedal mechanism of the Recalled Vehicles when they knew, or had reason to know, the true and correct facts regarding the defectiveness of the Recalled Vehicles Product, and that Toyota took steps to prevent these facts from becoming known to the general public in the marketing, promotion and sale of the Product.

43.     The concealment of the true facts from Plaintiff and other members of the Class was done with the intent to induce Plaintiff and Class members to purchase the Recalled Vehicles.

44.     The reliance by Plaintiff and Class members was reasonable and justified in that Toyota appeared to be, and represented itself to be, a reputable business.  Plaintiff and Class members would not have purchased the Recalled Vehicles had they known the true facts about the Recalled Vehicles, that they may result in potential death.

45.     As a direct and proximate result of the fraud and deceit alleged, Plaintiff and Class members were induced to purchase the Recalled Vehicles, who then used it for its intended and foreseeable purpose, and have suffered damages in an amount to be determined at trial

46.     Toyota knew, or should have known, that the design, testing, manufacture, assembly and development of the Recalled Vehicles as set forth in detail above was defective before it issued a recall, and that Toyota intended that the customers should rely on Toyota's representations that it was a reputable and reliable business, as well as Toyota's suppression of the true facts about the Recalled Vehicles, in buying the Recalled Vehicles.

47.     Plaintiff and other members of the Class, in purchasing and using the Recalled Vehicles, did rely on Toyota's above representations and suppression of facts, all to their damage as hereinabove alleged. In doing these things, Toyota was guilty of malice, oppression and fraud, and Plaintiff and Class members are, therefore, entitled to recover

punitive damages.

48.    Additionally, or in the alternative, Plaintiff and other members of the class suffered actual damages, including a diminution of value of the subject vehicles (the difference in market value of the product in the condition in which it was delivered, and its market value in condition in which it should have been delivered according to contract of parties).

## IX. FIFTH CAUSE OF ACTION
### (UNJUST ENRICHMENT)

49.    Plaintiff repeats and realleges all preceding paragraphs, as if fully set forth herein.

50.    As a result of Toyota's deceptive, fraudulent and misleading labeling, advertising, marketing and sales of the Recalled Vehicles, described in detail above, Toyota was enriched, at the expense of Plaintiff and the Class, through the payment of the purchase price for Toyota's Recalled Vehicles.

51.    Under the circumstances, it would be against equity and good conscience to permit Toyota to retain the ill-gotten benefits that it received from Plaintiff and other members of the Class in light of the fact that the Recalled Vehicles were not what Toyota purported them to be.  Thus, it would be unjust or inequitable for Toyota to retain the benefit without restitution to Plaintiff and other members of the Class for the monies paid to Toyota for such Recalled Vehicles.

### COUNT VI
### (BREACH OF THE COVENANT OF
### GOOD FAITH AND FAIR DEALING)

52.    Plaintiff re-alleges all prior paragraphs of this Complaint, as if set out forth herein in full an incorporated by reference.

53.    Plaintiff's Agreement with the Defendant includes not only express written provisions, but also those terms and conditions, which although not formally expressed, are implied by the Law.

54.    Such terms are as binding as the terms that are actually written into the agreement with Plaintiff, and those who are similarly situated against the Defendants.

55.     Inherent in all contracts and agreements is a covenant that the parties will act in good faith and deal fairly with each other in the performance of their respective covenants and obligations under the Agreement and not take any action that will injure the other party or compromise the benefit of the Agreement.

56.     The obligations of Defendants to abide by the covenant of good faith and fair dealing is heightened by the substantial imbalance of power between Defendants and the Plaintiff, which imbalance allows Defendants to implement the business scheme described in detail in this Complaint and incorporated by reference.

57.     Through the actions and inactions of the Defendants as outlined above, Defendants have failed to abide by the covenant of good faith and have failed to deal fairly with the Plaintiff and others similarly situated.

58.     As a proximate result of the aforesaid breach of the covenant of good faith and fair dealing by Toyota, Plaintiff and Class members have suffered damages in an amount to be determined at trial in that, among other things, they purchased and paid for a vehicle that did not conform to what was promised as promoted, marketed, advertised, packaged and labeled by Toyota, and they were deprived of the benefit of their bargain and spent money on a product that did not have any value or had less value than warranted or a product they would not have purchased and used had they known the true facts about it.. Plaintiff and other members of the class are further harmed in having to spend money on attaining other transportation while the Recalled Vehicles are being fixed. Additionally, or in the alternative, Plaintiff and other members of the class suffered actual damages, including a diminution of value of the subject vehicles (the difference in market value of the product in the condition in which it was delivered, and its market value in condition in which it should have been delivered according to contract of parties).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

- Certification of the Class, certifying Plaintiff as representative of the Class, and designating her counsel as counsel for the Class;

- An award of compensatory damages, the amount of which is to be determined at trial;

- For interest at the legal rate on the foregoing sums;

- For costs of suit incurred; and

- For such further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated:  February 3, 2010                    Respectfully submitted,

/s/ Brian W. Smith
Brian W. Smith, Esq.
Florida Bar No. 0470510
bws@smithvanture.com
Smith & Vanture, LLP
1615 Forum Place, Suite 4C
West Palm Beach, Florida 33401
(561) 684-6330 (ofc) (561) 688-0630 (fax)
**(Trial Counsel for the Plaintiff)**

1

2          Joe R. Whatley, Esq.
           jwhatley@wdklaw.com
3          Edith M. Kallas, Esq.
           ekallas@wdklaw.com
4          Patrick J. Sheehan, Esq.
           psheehan@wdklaw.com
5          Shujah A. Awan, Esq.
           sawan@wdklaw.com
6          Whatley, Drake & Kallas, LLC
7          1540 Broadway, 37th Floor
           New York, New York 10036
8          (212) 447-7070 (ofc)
9          **(Co-counsel for the Plaintiff –**
            **Pro Hac Vice pending)**
10

11         Howard Rubinstein, Esq.
           Florida Bar No. 0104108
12         HowardR@pdq.net
           Law Offices of Howard Rubenstein
13         914 Waters Ave., Suite 20
14         Aspen, Colorado  81611
           (832) 715-2788 (ofc)
15         **(Co-counsel for the Plaintiff)**

16

17         W. Daniel Miles, III
           Dee.Miles@beasleyallen.com
18         Timothy Fiedler, Esq.
19         Florida Bar No. 0301190
           Tim.Fiedler@BeasleyAllen.com
20         Beasley, Allen, Crow, et. al.
21         218 Commerce Street
           Montgomery, AL 36104
22         (800) 898-2034 (ofc)
           **(Co-counsel for the Plaintiff)**
23

24

25

26

27

28

# EXHIBIT "A"

# Toyota accused of 'not being frank' on problem

### Lawyers say that automaker hid dangers of pedals

BY JUSTIN HYDE
FREE PRESS WASHINGTON STAFF

WASHINGTON — When owners of Lexus sedans began reporting harrowing crashes involving stuck accelerator pedals in early 2007, Toyota told U.S. safety regulators there was no safety problem with its floor mats — but it would send owners an orange warning sticker just to be sure.

The flaw has since been linked to at least 12 deaths, and last week, Toyota expanded its recall over floor mats to 5.3 million vehicles. As with a separate recall of 2.3 million cars and trucks for sticky pedals that also could cause sudden acceleration, the automaker downplayed early warnings of both problems.

A Free Press review of documents from nine U.S. investigations since 2003 into sudden acceleration complaints show Toyota repeatedly ruled out many owner complaints, dismissed several concerns as posing no danger and modified models in production without offering similar changes to vehicles already on the road. Not until the 2007 floor mat investigation did any of the complaints lead to a recall.

Safety advocates and attorneys for owners suing over sudden acceleration say Toyota has simply stonewalled.

"I think Toyota is still scrambling to find the root causes of all the sudden acceleration that's been reported to them," said Don Slavik, a Milwaukee attorney representing a California man whose wife died in a crash off a cliff in their 2005 Toyota Camry that he blames on sudden acceleration.

The automaker has defended its actions, saying defects weren't found in most probes, that it fully cooperated with regulators and did not try to minimize safety concerns.

But Toyota also said it continuously reviews data for signs of safety defects, and would look back over prior complaints.

"We never truly close an investigation," said Toyota spokesman Brian Lyons.

## Toyota had to be pressured

With its decision to recall vehicles for faulty gas pedals, Toyota reversed calls it made in 2007 and 2008 that the same pedals weren't a safety threat in response to consumer complaints in the United States and Europe.

The Japanese automaker made several similar decisions in earlier investigations involving sudden acceleration, and had to be pressured by federal regulators into a recall of floor mats that could trap gas pedals. That recall has grown to cover 5.4 million vehicles.

Sean Kane, a safety researcher who works with attorneys pursuing cases against Toyota, said Friday that he had found 19 deaths and 341 injuries stemming from 815 separate crashes involving Toyotas and sudden acceleration.

"This company is not being frank about the causes of sudden acceleration," Kane said. "We need to get down to the cause, and get it resolved quickly."

Automakers launch most safety recalls on their own, without prodding from the National Highway Traffic Safety Administration. NHTSA keeps watch on consumer complaints it receives along with accident data, but has to rely on the companies for the data needed in safety investigations, which the automakers often try to interpret to their benefit. The Free Press reported last week that in 2003, Toyota hired a former NHTSA investigator to handle relations with the agency.

The agency typically gets a fairly small number of sudden-acceleration complaints annually, but in recent years, Toyota has received far more than other automakers. Over the past 10 years, NHTSA had launched more investigations into sudden acceleration in Toyotas than all other automakers combined.

## Hundreds of complaints

Since the 1990s, NHTSA had concluded that most sudden acceleration complaints were caused by drivers mistakenly hitting the gas pedal instead of the brake. When a Massachusetts man asked in April 2003 for an investigation of 1997-2000 model Lexus sedans, citing 271 complaints of unintended acceleration, the agency rejected his request without querying Toyota for data.

On Jan. 22, 2004, an elderly Las Vegas couple died after the 2002 Camry they were driving sped off the fourth floor of a parking deck at the Golden Nugget casino. Their son later told NHTSA that witnesses saw the car stop, then accelerate off the deck.

In February 2004, a nurse from Maryland asked the agency to review the 2002 and 2003 Lexus ES350 sedans, saying her throttle had malfunctioned several times and led to one crash. A month later, NHTSA launched a wider investigation into the electronic throttles on nearly 1 million Lexus and Toyota sedans, citing more than 100 complaints.

From the start, Toyota pushed NHTSA to narrowly define the problem as short bursts where the engine surged to "something less than a wide-open throttle." It compared many of the complaints to the prior sudden acceleration cases that NHTSA had deemed driver error. Toyota also said the computer could not open the throttle without the accelerator pedal being pressed, and said even if built-in safety checks failed, stepping on the brakes would stop the car.

But the company did reveal that it was conducting a "customer satisfaction campaign" to replace motors controlling the throttle, which could fail and send vehicles into a "limp home" mode. Such campaigns are typically made available to only owners who suffer the problem. It also admitted it bought back two vehicles from owners who had complained of repeated sudden-acceleration events.

After four and a half months, NHTSA closed its investigation, saying it could find no evidence of a defect and no trends in warranty and repair data suggesting faulty electric parts. Since then, no NHTSA investigation has found a defect in Toyota's electronic throttle controls.

Despite the findings, owners kept asking the agency for another look.

## Keep digging

Three times — in 2005, 2006 and 2008 -- Toyota customers asked NHTSA to investigate uncontrolled acceleration in their vehicles stemming from electronic throttle controls. Despite

hundreds of complaints, NHTSA found no evidence of a defect in any of the cases. In all cases, Toyota provided data it said showed no evidence of defects, and in the 2008 look into Tacoma pickups, Toyota contended many of the complaints were "inspired by publicity."

Jordan Ziprin, a retired Phoenix attorney who filed the 2006 request, said the new recalls were evidence that Toyota was hiding its problems with electronic engine controls.

"It's just a matter of time before they get to that issue, which is going to be very, very expensive for Toyota," he said.

NHTSA officials declined to comment.

Toyota did find some problems that needed fixing – just like the pedals in 2007 and 2008.

During the 2006 investigation, Toyota discovered corrosion inside some throttles on Camry sedans and changed the part in production. But it did not make the change available to vehicles on the road and minimized the change to NHTSA, saying it would only happen "under certain circumstances, such as driving through a flooded road, in the heavy rain, or a hurricane."

# Fixing part of the problem

But with the investigations of Lexus floor mats that began in March 2007, the company's actions were not sufficient to satisfy NHTSA. After reports of seven injuries from vehicles with pedals trapped by all-season floor mats, Toyota once again said there was no safety issue. It did say it would mail owners and dealers with instructions for how to install the floor mats, along with an orange sticker and doubling the height of a warning embossed on the surface to 10 millimeters.

"There is no possibility of the pedal interference with the all-weather floor mat if it's placed properly and secured," the automaker told regulators in April 2007.

But by August, federal regulators had found 12 deaths linked to the mats. A survey of 600 Lexus owners found 59 reporting sudden or unexpected acceleration. NHTSA also found evidence that in some crashes, owners were standing on the brakes yet unable to stop their vehicles. Toyota issued its first recall in September 2007 covering 55,000 vehicles.

NHTSA began testing some of Toyota's claims about the problem. It found that the brakes in the Lexus ES350 sedan could stop an engine at wide-open throttle – but only after 1,000 feet, and only with five times the amount of pressure usually needed to bring the car to a halt.

Regulators were also worried about confusion from the start-stop buttons that Toyota had installed in many models instead of keys. The automaker told regulators that the engine could be shut off in an emergency if drivers held the button for three seconds.

But early in 2009, as part of another customer petition, Toyota disclosed that its owner's manuals incorrectly stated that the start-stop buttons would turn the vehicle off only if the transmission was in park. Toyota said it would change manuals for new models, but once again did not offer to update those already on the road.

And despite a rising tally of injuries and crashes, including the death of a California Highway Patrol officer and three family members, it would take another two years for Toyota to expand the floor mat recall to several other models. When it did in September of last year, it denied at first that the issue met the legal standard for a defect.

Under pressure from NHTSA officials, Toyota relented and dubbed the move a recall. In November, it agreed to make software changes that would shut down a gas pedal if the brakes were applied at the same time, along with reshaping the pedals to avoid contact. Those fixes aren't expected to be available until April.

Toyota also will buy back all all-season floor mats that first launched the investigation, telling regulators that "Toyota appreciates this opportunity to cooperate with NHTSA."

Toyota President Akio Toyoda broke his silence over the recalls Friday on the sidelines of the World Economic Forum in Davos, Switzerland, with an apology to owners.

"We're extremely sorry to have made customers uneasy," Toyoda told Japan broadcaster NHK. "We plan to establish the facts and give an explanation that will restore confidence as soon as possible."

*Contact JUSTIN HYDE: 202-906-8204 or jhyde@freepress.com*

EXHIBIT "B"

YOU ARE HERE: LAT Home→Collections→Defective Products

# Toyota found to keep tight lid on potential safety problems

*A Times investigation shows the world's largest automaker has delayed recalls and attempted to blame human error in cases where owners claimed vehicle defects.*

December 23, 2009|By Ken Bensinger and Ralph Vartabedian

During a routine test on its Sienna minivan in April 2003, Toyota Motor Corp. engineers discovered that a plastic panel could come loose and cause the gas pedal to stick, potentially making the vehicle accelerate out of control.

The automaker redesigned the part and by that June every 2004 model year Sienna off the assembly line came with the new panel. Toyota did not notify tens of thousands of people who had already bought vans with the old panel, however.

It wasn't until U.S. safety officials opened an investigation last year that Toyota acknowledged in a letter to regulators that the part could come loose and "lead to unwanted or sudden acceleration."

In January, nearly six years after discovering the potential hazard, the automaker recalled 26,501 vans made with the old panel.

In a statement to The Times, Toyota said that there was no defect in the Sienna and that "a safety recall was not deemed necessary" when it discovered the problem in 2003. The company called the replacement part "an additional safety measure."

A peerless reputation for quality and safety has helped Toyota become the world's largest automaker. But even as its sales have soared, the company has delayed recalls, kept a tight lid on disclosure of potential problems and attempted to blame human error in cases where owners claimed vehicle defects.

The automaker's handling of safety issues has come under scrutiny in recent months because of incidents of sudden acceleration in Toyota and Lexus vehicles, which The Times has reported were involved in accidents causing 19 fatalities since 2001, more deaths from that problem than all other automakers combined.

After Toyota this fall announced its biggest recall to address the sudden-acceleration problem, it insisted publicly that no defect existed. That drew a rare public rebuke from the National Highway Traffic Safety Administration, which chastised the automaker for making "inaccurate and misleading statements."

In the wake of Toyota's announcement of the massive recall, The Times examined some of the ways the automaker has dealt with safety problems in recent years and found that:

* The automaker knew of a dangerous steering defect in vehicles including the 4Runner sport utility vehicle for years before issuing a recall in Japan in 2004. But it told regulators no recall was necessary in the U.S., despite having received dozens of complaints from drivers. Toyota said a subsequent investigation led it to order a U.S. recall in 2005.

* Toyota has paid cash settlements to people who say their vehicles have raced out of control, sometimes causing serious accidents, according to consumers and their attorneys. Other motorists who complained of acceleration problems with their vehicles have received buybacks under lemon laws.

* Although the sudden acceleration issue erupted publicly only in recent months, it has been festering for nearly a decade. A computerized search of NHTSA records by The Times has found Toyota issued eight previous recalls related to unintended acceleration since 2000, more than any other automaker.

* A former Toyota lawyer who handled safety litigation has sued the automaker, accusing it of engaging in a "calculated conspiracy to prevent the disclosure of damaging evidence" as part of a scheme to "prevent evidence of its vehicles' structural shortcomings from becoming known" to plaintiffs lawyers, courts, NHTSA and the public.

As a result, plaintiffs attorneys are considering reopening dozens of product-liability suits against the automaker.

Toyota has called the allegations of the attorney, Dimitrios Biller, "both misleading and inaccurate" and noted that he is also suing another former employer. The company said it had "acted appropriately in product liability cases and in all reporting to federal safety regulators."

In a written statement to The Times, Toyota said that it strove to keep government officials and consumers informed about potential safety problems with its vehicles, which it says are tested to meet or exceed federal standards.

"Toyota has absolutely not minimized public awareness of any defect or issue with respect to its vehicles," the company said.

Currently, Toyota is a defendant in at least 10 lawsuits alleging unintended acceleration that caused five fatalities and four injuries. Two of those suits are seeking class-action status.

But few, if any, sudden-acceleration cases ever make it to trial, according to attorneys who handle such cases.

After a 2007 crash of a Camry that accelerated out of control for 20 miles before killing the driver of another car in San Jose, Toyota was sued by members of the victim's family. Their attorney, Louis Franecke, said the automaker "didn't want to go to trial," and paid them a seven-figure sum in exchange for dropping the case and signing a non-disclosure form.

In an interview, Guadalupe Gomez, the driver of the runaway Camry, said he also signed a confidentiality agreement and received a settlement from Toyota. He was initially arrested on suspicion of manslaughter for causing the crash, but charges were never filed.

By settling, Toyota has managed to keep potentially damaging information out of the public eye, said Raymond Paul Johnson, a Los Angeles attorney who said he had settled four sudden-acceleration cases with the automaker.

"It's just a matter of risk control for them," Johnson said.

Toyota said that although it does not comment on individual cases, it "has resolved and will continue to resolve matters with litigants through confidential settlement when it is in both parties' interests to do so."

The majority of unintended acceleration incidents don't end up in accidents. But even after minor incidents, some consumers have obtained deals under which their cars were repurchased on favorable terms.

Tim Marks, a small businessman in Camden, Ark., parked his daughter's 2006 Lexus IS 250 in front of the dealership last year and said his family would never drive it again after experiencing four sudden-acceleration events.

"They told my daughter she was texting while driving and wasn't paying attention," Marks recalled. "She is a 95-pound, little itty-bitty thing, but she was fixing to twist off on that man."

The vehicle was bought back and the title branded as a lemon, according to vehicle registration records. It was later registered in Florida, suggesting that the dealer resold it.

Much the same thing happened to Joan Marschall, a Visalia resident whose 2003 Camry accelerated on its own three times before she complained.

"I took it to the dealer and said I wouldn't drive it again," Marschall recalled. "I said I don't care if you tell me the computer says nothing happened. I know it did."

Marschall received a lemon buyback too. Registration records show the car was transferred to a new owner in Southern California.

Toyota said it had no policy to repurchase vehicles from customers complaining about sudden acceleration, though its dealers may act on their own to "preserve goodwill."

Some motorists who have confronted safety issues said the automaker has hidden information from them.

In January, Jeffrey Pepski, a financial consultant in suburban Minneapolis, took his 2007 Lexus ES 350 to the dealer after it accelerated out of control on a Twin Cities freeway, reaching 80 miles per hour.

Toyota sent an expert to examine the car Feb. 3 and download electronic data stored on the vehicle's computers. When Pepski asked for a copy of the data, he was refused.

"They said it was proprietary," Pepski recalled.

He filed a defect petition with NHTSA, and the dealer allowed Pepski to trade in the sedan for a sport utility vehicle. The Lexus ES was not branded a lemon and was resold in Minnesota, records show.

How Toyota handles requests like Pepski's has frustrated investigators and vehicle owners who want to get information contained on computers in their vehicles.

Nearly all new cars today contain an event data recorder, often called a black box, that can record several seconds of key information when accidents occur or in other circumstances.

According to Toyota, its black boxes can capture vehicle speed, engine speed, brake pedal application, accelerator pedal position and seat belt usage, among other things. That data, experts say, could be crucial to investigating causes of sudden acceleration.

Unlike manufacturers such as General Motors Co. and Ford Motor Co., Toyota's data recorders are extremely difficult for non-Toyota personnel to read, said W.R. "Rusty" Haight, a black-box expert who owns a San Diego collision investigation company.

Toyota says it has only one device in the U.S. that can read the data. An operating manual for the device, a copy of which was reviewed by The Times, indicates that it takes two passwords to operate.

On its website, Toyota says that it "will not honor EDR readout requests from private individuals or their attorneys," because its device is a prototype.

On some safety issues, Toyota has little choice but to go public.

Sudden acceleration didn't become a national issue for the automaker until this fall, when it announced its largest recall shortly after a 2009 Lexus ES accelerated out of control and crashed in San Diego County, killing an off-duty California Highway Patrol officer along with his wife, daughter and brother-in-law.

In a 5:30 a.m. conference call the day before Thanksgiving, Toyota detailed remedies to prevent acceleration problems it has blamed on gas pedals trapped by floor mats. Toyota will replace or modify pedals, replace floor mats, modify floor well padding and add new safety software to seven models, representing 4.26 million cars and trucks.

The campaign follows eight recalls in the U.S. over the last decade to fix problems that in the automaker's own words could cause sudden acceleration or faulty throttle system operation, Times research shows.

Two years ago, a NHTSA investigation found that the gas pedal in Camry and Lexus ES sedans could be trapped by rubber all-weather floor mats -- the same problem being addressed in the current recall. Toyota responded by recalling 55,000 of the vehicles, but only enlarged a warning label on the underside of the mat and on its packaging.

In 2005, Toyota recalled 3,567 Lexus IS 250 sedans because the gas pedal had a propensity to stick on a floor pad. In 2006, it recalled 367,594 Highlander and Lexus RX SUVs after receiving complaints that an interior cover could interfere with the accelerator pedal, keeping it depressed.

All those followed a 2003 recall in Canada of 408 Celicas, also for floor mat interference with the accelerator pedal.

In the ongoing Sienna recall, Toyota is replacing a hard-plastic trim panel over the center console. In its statement to The Times, the automaker said that pedal entrapment could only be caused in the event of a missing attachment clip, which might not be replaced after service work.

Toyota said it issued the recall voluntarily after a single complaint to NHTSA prompted an investigation by the agency. "In response to Toyota's voluntary campaign, regulators closed the investigation," the company said.

NHTSA officials did not respond to a written question about the recall and the agency's oversight of the matter.

The Sienna incident wasn't the only time that Toyota issued a recall long after discovering a problem.

In 1994, NHTSA slapped Toyota with a $250,000 fine, at the time the agency's second-largest, for providing misleading information about a fuel leak in Land Cruisers and waiting two years to undertake a recall to fix the problem. Toyota acknowledged that it failed to conduct a timely recall but denied withholding information from the agency.

A decade later, Toyota recalled about 330,000 vehicles in Japan after a 2004 crash there -- caused by a broken steering linkage -- seriously injured five people. The vehicle in the accident, a Hilux Surf, was sold in the U.S. as the 4Runner. Other truck models sold here, including the Toyota 4x4 and T100 pickups, also used the same linkage, a steering relay rod.

Despite that, the company told NHTSA in an October 2004 letter that it would not conduct a U.S. recall because it had not received information here indicating a problem with the part.

Documents entered in four lawsuits filed in Los Angeles this year, however, show that Toyota had received numerous consumer complaints dating from 2000 and had replaced dozens of the parts under warranty. The documents also show that Japanese police, in an investigation of the defect, said that

Toyota employees had known about the problem since 1992 and should have initiated a recall immediately.

In September 2005, Toyota recalled nearly 1 million vehicles in the U.S. to replace the part, its second-largest campaign.

It came too late for Zackary Audulewicz of Ila, Ga., relatives said. The 20-year-old was driving his Toyota 4x4 to work in August 2003 when the pickup lost control. A witness said she heard a pop and saw a spark just before the pickup careened off the road, flipped into the air and rolled on its roof. Audulewicz was killed instantly.

"I feel like they knew about the problem long before the recall," said Don Audulewicz, Zackary's father and one of the plaintiffs in the suits. "I can't understand why whoever was making decisions at Toyota would do that."

Toyota declined to discuss the case, citing its policy not to comment on pending litigation. In a written statement, Toyota explained that its own investigation of the defective steering component part led it to broaden the recall to include the T100 truck.

On several occasions in the last decade, Toyota has been admonished by judges for failing to provide evidence. In 2000, for example, a Missouri state judge sanctioned it for failing to disclose results of five rear-impact tests of Corollas "despite numerous discovery requests." He ordered a new trial.

In 2007, California's Court of Appeal found that "Toyota had intentionally violated two orders compelling discovery" of stability test results in a case involving a Toyota-made forklift that tipped over and killed a worker. The court slapped Toyota with a $138,984.33 sanction and ordered a new trial. Toyota, which denied wrongdoing, ultimately settled the case.

E. Todd Tracy, a Texas attorney with 22 years of experience litigating against automakers, believes that Toyota's issues with legal discovery run far deeper than a few sanctions.

Over the last three months, he has moved to reopen 17 lawsuits against the automaker related to vehicle rollovers because he now believes Toyota routinely hid information in those cases.

His argument rests on four boxes of documents submitted by Biller, the former Toyota attorney. The contents have not yet been revealed, but Tracy believes they prove that Toyota hid crucial information about rollovers in those lawsuits.

"This is clearly information that Toyota does not want the public to see," Tracy said. "For years, they were the gold standard, but right now they have more problems than they know what to do with."

ken.bensinger@latimes.com

ralph.vartabedian@

latimes.com

Times staff writers Doug Smith and Thomas Suh Lauder contributed to this report.

**JS 44** (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Ca**

**Feb. 3, 2010**

FILED by __ D.C.
ELECTRONIC

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## I. (a) PLAINTIFFS

ARLENE S. HEILBRUNN, as an individual and on behalf of all others similarly situated

## DEFENDANTS

TOYOTA MOTOR CORPORATION, a fo
TOYOTA MOTOR SALES, USA, INC., a California corporation,

**(b)** County of Residence of First Listed Plaintiff **Palm Beach**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant ____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Brian W. Smith, Esq.
Smith & Vanture, LLP
1615 Forum Place, Suite 4C
West Palm Beach, Florida 33401

Attorneys (If Known)

unknown

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

10 CV 80208 WJZ/RSR

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO
b) Related Cases ☐ YES ☑ NO

JUDGE ____

DOCKET NUMBER ____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. Section 1332(d)(2)

LENGTH OF TRIAL via **8-10** days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 2/3/10

FOR OFFICE USE ONLY

AMOUNT ____ RECEIPT # ____ IFP